IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

RENEE A. JONES,                    *

    Plaintiff,                 *

vs.                                *          CASE NO. 3:17-CV-13 (CDL)

ZACH BARRETT and JACOB PALMER,     *

    Defendants.                *

_____

O R D E R

Plaintiff Renee Jones claims that Defendant Zach Barrett, a sergeant with the Walton County Sheriff's office, had an informant named Rodney Jones plant drugs in her car without her knowledge. Defendant Jacob Palmer, a sheriff's deputy, later discovered those drugs during a traffic stop. Plaintiff was arrested for drug possession, but the charges were subsequently dropped. Plaintiff brought a number of claims against Defendants under 42 U.S.C. § 1983 and Georgia law. Defendants filed a summary judgment motion, arguing that they are entitled to qualified immunity on Plaintiff's federal claims and official immunity on her state law claims. In response to Defendants' summary judgment motion, Plaintiff abandoned her claims against Palmer and pursued only her claims against Barrett. *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. 10 n.6, ECF No. 51. Therefore,

the Court grants Defendants' summary judgment motion (ECF No. 43) as to Plaintiff's claims against Palmer.

As to her remaining claims against Barrett, the key question is whether a jury could find that Barrett instructed or knowingly allowed Rodney to plant drugs in Plaintiff's car without her knowledge. Based on Plaintiff's version of the events, the Court finds, as explained below, that a jury could reach that conclusion. And because a reasonable law enforcement officer would understand that knowingly planting illegal contraband on someone and then insisting on criminal prosecution of that person violates clearly established law, Barrett is not entitled to qualified immunity or official immunity on Plaintiff's false arrest, malicious prosecution, and false imprisonment claims. The Court thus denies Defendants' summary judgment motion on those claims. The Court does, however, grant Defendants' summary judgment motion as to Plaintiff's Fourteenth Amendment due process claim.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing

summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the record reveals the following facts.

## I.   The Plan

Defendant Zach Barrett was a sergeant working in the narcotics investigation unit of the Walton County Sheriff's Office. The Sheriff told Barrett that he had been receiving complaints about Plaintiff "trading sexual favors for crack," and he asked Barrett if he "could look into it." Barrett Dep. 86:24-87:7, ECF No. 46-2. Barrett told Defendant Jacob Palmer, a deputy sheriff, that the Sheriff "wanted [Plaintiff] in jail." Palmer Dep. 54:1-5, ECF No. 46-1.

The Sheriff gave Barrett Plaintiff's name, general residence location, and vehicle description. Barrett Dep. 88:23-89:5. After finding Plaintiff's address in the Sheriff's computer system, Barrett and other narcotics unit officers conducted surveillance of Plaintiff's residence. That surveillance did not reveal any evidence of illegal drug activity. And, when other

deputies conducted a traffic stop of Plaintiff, they did not find any evidence of illegal drugs.

One or two weeks after their initial meeting about Plaintiff, the Sheriff asked Barrett about the investigation. The Sheriff told Barrett that if he did not get Plaintiff arrested, the Sheriff would do it himself. Barrett Dep. 94:7-10. After that meeting, Barrett met with Palmer and "stressed the fact that the sheriff wanted [Plaintiff] in jail." Palmer Dep. 57:19-25. Barrett decided to set up a reverse sting operation; he stated in an interview that he was "trying to do a good thing and think outside the box and try to find a way to lock up somebody who just uses [drugs]." Pl.'s Notice of Filing Original Disc. Ex. 20, Barrett Interview 15:19-15:37 (Jun. 18, 2015) (hereinafter Barrett Interview), ECF No. 47. To do this, he needed the help of a confidential informant.

Rodney Jones had been a confidential informant for the narcotics unit on multiple occasions. Narcotics unit deputies asked Rodney if he knew Plaintiff, and he responded that he had sold crack cocaine to her in the past and that Plaintiff traded sex acts for crack. Barrett decided to use Rodney for the reverse sting operation, and he testified that the plan was to provide drugs to Rodney and have Rodney attempt an illegal drug transaction with Plaintiff. Barrett Dep. 93:10-11, 110:4-17, 120:3-10. Rodney was to ask Plaintiff for a ride in her car and

was "to exchange the drugs for money" when Plaintiff was driving him, but it was also "fine with" Barrett if Rodney simply "exchange[d] the ride for the drugs" if Plaintiff would not buy them. *Id.* at 111:25-112:11; *accord* Tallant Dep. 46:1-6, ECF No. 46-3 (agreeing that the plan was for Rodney to go to Plaintiff's house and "try to sell her or give her or exchange or [have] some anticipated transaction where drugs move from Rodney to [Plaintiff]"); Pl.'s Notice of Filing Electronic Media Attach. 1, Narcotics Channel Audio Recording 3:48-3:52 (Feb. 16, 2015), ECF No. 63 (hereinafter Narcotics Channel) (stating that Plaintiff would "be getting that crack cocaine in exchange for the ride"). If Rodney was successful, Barrett would pay him $250, a significant premium over his typical narcotics unit pay of $40 to $60. Plaintiff was apparently a high value target. And Rodney was the man for the job.

Although Rodney has given conflicting stories of his instructions from Barrett, one version of Rodney's description of events would support the conclusion that his job was to get the drugs into Plaintiff's possession no matter how it was done. In a letter to the Sheriff weeks later, Rodney stated that Plaintiff "was innocent" and that the "dirty deputies gave [him] drugs

(cocaine & weed) to give her, they set her up!!!!" Barrett Dep. Ex. 23, Letter to Mr. Chapman, ECF No. 46-5 at 57.[1]

Defendants contend that Rodney was never told to plant drugs in Plaintiff's car without her knowledge, *see, e.g.,* Rodney Jones Decl. ¶¶ 4 & 5, ECF No. 43-1, but when viewed in combination with Rodney's statement in his letter to the Sheriff, other circumstantial evidence exists that creates a genuine fact dispute on this issue.

First, this entire operation must be viewed against the backdrop that Barrett was under extreme pressure to arrest Plaintiff. The Sheriff had shamed him by proclaiming that he would have to go arrest Plaintiff if Barrett could not get the job done. This scolding occurred after Barrett's more traditional police methods had produced no results. Second, Barrett instructed Rodney to "do his best to leave [the crack

---

[1] Defendants object to the letter as unauthenticated hearsay. Plaintiff asserts that Defendants had not previously raised an authenticity challenge to the letter; rather, Defendants admitted that the Sheriff received a letter from Rodney and that the letter contained at least one statement on which Plaintiff now relies. *See* Answer ¶¶ 52-53, ECF No. 13 (admitting ¶¶ 52-53 of the Complaint); Compl. ¶¶ 52-53, ECF No. 1 (alleging that the Sheriff received a letter from Rodney stating that deputies "set [Plaintiff] up"). Plaintiff further contends that she will be able to authenticate the letter at trial and will be able to reduce the statements in the letter to admissible form at trial. Without deciding today whether the letter would be admissible at trial, the Court does find that Plaintiff has made a sufficient showing that the evidence will be reducible to admissible form at trial. Therefore, the court will consider it for summary judgment purposes. If the evidence is not admitted at trial, the Court will obviously take that into consideration when considering qualified immunity at that time. The Court does note that most of the assertions in the letter are corroborated by the officers' own words on the Narcotics Channel recording.

cocaine] in the passenger side door so [Plaintiff] can't get it and stuff it." Narcotics Channel 3:55-4:03. This suggests that the purpose of the operation was not to determine whether Plaintiff would knowingly accept drugs in exchange for something of value but to make sure that drugs were placed securely in her car so that they would be found later by law enforcement officers. As a backup or to justify a search of her car after a traffic stop, Rodney was given "loud" marijuana for his car ride with Plaintiff, so that a strong scent would be left behind either for a narcotics officer or for a narcotics canine to pick up during a traffic stop. Narcotics Channel 3:30-3:47. Barrett of course disputes that he had any intention of planting drugs on Plaintiff, but it is Plaintiff's version of the evidence that counts most at summary judgment.

## II. The Operation

On February 16, 2015, deputies gave Rodney crack cocaine and marijuana in a cigarette pack. The deputies also placed an electronic device (a "bug") on Rodney so that the officers could record his conversation with Plaintiff and hear it in real time. The sound quality of the equipment deputies used to monitor the bug in real time was poor, and one deputy, Timothy Tallant, testified that he could only hear bits and pieces of the conversation between Rodney and Plaintiff due to the poor sound quality and a barking dog. Tallant Dep. 54:4-13. It is not

clear from the present record which bits and pieces Tallant did hear. Barrett admitted that he could not hear the conversation in real time as clearly as he could hear the recording after the fact, Barrett Dep. 116:1-3, but he did testify about specific portions of the conversation that he did hear in real time, *id.* at 114:7-116:10.

Rodney went to Plaintiff's house, and Plaintiff opened the door when he knocked. It was cold and raining, and Rodney told Plaintiff he needed a ride and that he would "pay [her] good." Defs.' Mot. for Summ. J. Ex. 1, Bug Recording 6:44-6:54, ECF No. 42 ¶ 2. Rodney went into Plaintiff's house. Plaintiff told Rodney to get out of her house, but she agreed to give Rodney a ride if he would not come to her house or call her again. Pl.'s Dep. 84:12-85:2, ECF No. 45. Rodney showed Plaintiff that he had some marijuana and crack in a cigarette pack. *Id.* at 90:11-19, 91:5-9, 91:23-92:5, 93:15-94:18. He told Plaintiff that he would "bless" her with some "good dope," although Plaintiff did not hear him say that because he said it when she was in the middle of telling him about how her neighbor's dog had been hit by a car. Bug Recording 13:00-13:11. Then, Rodney asked Plaintiff if he could come back over later—he said he would "pay [her] good." *Id.* at 14:08-14:30. Plaintiff said no several times. Then Rodney said he would give her "this" plus "fifty dollars." *Id.* Plaintiff replied, "Man, I got dope. I got dope right now." *Id.*

Plaintiff later testified that she did not actually have any drugs in her house; she just told Rodney she did so he would get out of her house. Pl.'s Dep. 97:10-19. Plaintiff did ask Rodney, "what did you do with it? Or did you leave it here?" Rodney responded, "I'm going to give it to you in your hands." Bug Recording 15:04-15:09.

It is not clear from the present record how much of this conversation the deputies heard in real time. Barrett did hear Plaintiff say at some point that she did not smoke crack anymore because it upset her stomach. Barrett Interview 9:53-10:04. When he heard that, Barrett became concerned that the reverse sting operation would not work, presumably because Plaintiff would not accept the drugs from Rodney. *Id.* at 9:53-11:03.

Plaintiff drove Rodney to his son's house. The deputies did not hear any explicit agreement for Plaintiff to trade the ride for drugs. Rodney said that he was "fixin' to give" Plaintiff "all this weed . . some good dope." *Id.* 20:53-21:13. He asked Plaintiff where she wanted it, and he told her that he was going to put it "right here." Bug Recording 20:53-21:13. Barrett testified that he heard Rodney say that he would take care of Plaintiff and that he would put the drugs "right here." Barrett Dep. 113:2-3, 114:14-17. Plaintiff, however, did not hear Rodney say any of that, so she did not tell Rodney to keep the drugs,

she did not protest him leaving the drugs in her car, and she did not tell Rodney to take the drugs back. Pl.'s Dep. 115:3-25.

Rodney left the drugs in the cigarette pack and placed the cigarette pack in a coin holder in the front of Plaintiff's car. Narcotics Channel 17:05-17:18. Plaintiff dropped off Rodney. Rodney stated in his declaration that he "did not 'plant' drugs on [Plaintiff] or in her car, meaning [he] did not put drugs in her car without her knowledge." Rodney Jones Decl. ¶ 5. This declaration is inconsistent with Rodney's letter to the Sheriff alleging that the officers set-up the Plaintiff. Moreover, Plaintiff testified that she did not know that Rodney was leaving the drugs in her car. Pl.'s Dep. 115:18-25. Thus, the evidence viewed in the light most favorable to Plaintiff is that Plaintiff had no idea Rodney left the drugs in her car and that Rodney and the officers knew that she was unaware of the drugs.[2]

### III. The Debriefing

After Plaintiff dropped Rodney off, he spoke to the officers. Rodney told the officers that he had left the drugs in "the middle" in a blue "cigarette pack." Bug Recording 22:43-

---

[2] The Court is aware that the Eleventh Circuit has instructed the lower courts to "accept facts clearly depicted in a . . . recording even if there would otherwise be a genuine issue about the existence of those facts." *Shaw v. City of Selma*, No. 17-11694, 2018 WL 1180059, at *1 n.1 (11th Cir. Mar. 7, 2018). "But where the recording does not clearly depict an event or action, and there is evidence going both ways on it," the Court must take the non-moving party's version of what happened. *Id.* Here, the cited portions of the audio recording do not clearly depict what happened in the car.

23:57.  At that point, the officers did not know if Plaintiff had
paid money for the drugs.  Barrett Dep. 113:2-114:6.  Rodney
later told officers that he traded the drugs for a ride from
Plaintiff.  *Id.*

**IV.  The Traffic Stop**

The deputies planned to stop Plaintiff while she was in her
car with the drugs.  Barrett had told the deputies that Rodney
would pay Plaintiff "with some dope in exchange for the ride" and
that he wanted the deputies to stop Plaintiff after she dropped
off Rodney but before she got home.  Narcotics Channel 3:14-3:28.
Two deputies were positioned on Plaintiff's likely route home.
Barrett said that he would try to "tail" Plaintiff and get "PC"
(presumably, probable cause) for a traffic stop, and he explained
that there would be drugs in Plaintiff's car.  Narcotics Channel
6:18-6:30.

Plaintiff turned on to a two-lane road with double yellow
lines separating the lanes.  As luck would have it, Plaintiff
allegedly crossed the double lines, committing a dangerous
traffic violation.  Barrett was a passenger in an unmarked truck
somewhere behind Plaintiff's car.  It is clear that he told
Palmer that Plaintiff was "failing to maintain lane."  Defs.'
Mot. for Summ. J. Ex. 8, Palmer Video 0:19-0:24, ECF No. 42 ¶ 1.
But it is not clear from the present record whether Barrett was
actually in a position to see whether Plaintiff committed a

traffic violation. It is undisputed that Barrett and Tallant were not immediately behind Plaintiff's car. Barrett believed that he and Tallant were "mobile behind her on the road" when he said on the radio that Plaintiff was failing to maintain lane. Barrett Dep. 21:21-22:5. But Tallant, the driver of Barrett's vehicle, testified that he did not think they followed Plaintiff because they knew there was a traffic unit ahead of them to see her. Tallant Dep. 52:18-20.

Based on Barrett's statement that Plaintiff was failing to maintain her lane, Palmer initiated a traffic stop. He explained that he stopped her for "driving in the middle of the road." Palmer Video 1:36-1:39. Plaintiff consented to a search of her car and her pockets. Palmer found the cigarette pack in the coin holder. When Palmer opened it, he found a baggie of marijuana and what appeared to be crack cocaine. Plaintiff told Palmer that Rodney left the drugs in her car, that Palmer knew Rodney had left the drugs in her car, and that he pulled her over because of it. Narcotics Chan 15:45-16:05. Palmer told Barrett that Plaintiff immediately realized the connection between her arrest and Rodney; Barrett advised Palmer that they could "always say that 95% of the people we stop say it's not theirs—that somebody left it in there." Narcotics Channel 16:12-16:20.

Palmer arrested Plaintiff for possession of marijuana and cocaine, and she was issued a warning for the traffic offense.

The initial arrest was warrantless, but Palmer applied for a warrant at Barrett's direction while Plaintiff was still incarcerated. Plaintiff appeared before a judge on February 17, 2015, and bond was set based on the drug possession charge. She was released from jail on February 18, 2015 after her mother posted her bond.

## V.    The Aftermath

Barrett instructed Palmer to write the incident report as a normal traffic stop without referencing the fact that a confidential informant or the narcotics unit was involved. After Palmer applied for and was issued an arrest warrant, an assistant district attorney interviewed Barrett about the case. Barrett did not tell the assistant district attorney that he had been working with Rodney on the case, that the drugs were from the narcotics unit's evidence locker, or that the Bug Recording existed. The assistant district attorney filed an accusation against Plaintiff. Plaintiff's criminal defense attorney eventually learned about Rodney's confidential informant status and filed a motion to suppress and a notice of the affirmative defense of entrapment, asserting that Rodney conspired with deputies to plant drugs in Plaintiff's car without her knowledge. The State later dismissed the criminal drug charges against Plaintiff.

DISCUSSION

Plaintiff asserts the following claims against Barrett under 42 U.S.C. § 1983: (1) false arrest based on Barrett's alleged plan to plant drugs on Plaintiff without her knowledge, (2) malicious prosecution based on Barrett's decision to direct Palmer to seek an arrest warrant even though he allegedly knew that Plaintiff did not knowingly possess any drugs, and (3) denial of procedural due process based on Barrett's failure to disclose Rodney's confidential informant status and the narcotics unit's involvement to the prosecutor. Plaintiff also asserts state law claims for false imprisonment and malicious prosecution.[3]  Barrett seeks summary judgment on all claims, arguing that he is entitled to qualified immunity on Plaintiff's federal claims and official immunity on her state law claims.

## I.  Qualified Immunity Basics

Qualified immunity protects government officials engaged in discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified

---

[3] Plaintiff "does not oppose the dismissal of her claims against Deputy Palmer." Pl.'s Resp. to Defs.' Mot. for Summ. J. 10 n.6, ECF No. 51. Therefore, the Court grants Defendants' motion for summary judgment as to Plaintiff's claims against Palmer and considers only her claims against Barrett.

immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Qualified immunity does *not* protect an officer who knew or reasonably should have known that his actions would violate the plaintiff's constitutional rights. *Carter v. Butts Cty.*, 821 F.3d 1310, 1319 (11th Cir. 2016).

Plaintiff does not dispute that Barrett was acting in the scope of his discretionary authority when he took the actions Plaintiff challenges. Therefore, Plaintiff must demonstrate that qualified immunity is not appropriate by showing that the facts viewed in the light most favorable to her establish that Barrett violated a constitutional right that was clearly established at the time of Barrett's conduct. *See, e.g., Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016) (explaining two-part qualified immunity inquiry). All material fact disputes must be resolved in Plaintiff's favor; her evidence must be believed so that her "best case" is before the Court. *Stephens v. DeGiovanni*, 852 F.3d 1298, 1313-14 (11th Cir. 2017) (quoting *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008)).

## II. False Arrest Claims

Plaintiff asserts a false arrest claim, contending that she was arrested without probable cause. An "arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." *Carter*, 821 F.3d at 1319 (quoting *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996)). "But where probable cause supports an arrest, it acts as 'an absolute bar to a section 1983 action for false arrest.'" *Id.* (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)). "Probable cause to arrest exists if 'the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Kingsland*, 382 F.3d at 1226). Even if an officer does not have probable cause to arrest, the officer is entitled to qualified immunity if arguable probable cause supported the arrest, which means that "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." *Id.* at 1319–20 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, (1987)). "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who *unreasonably* conclude that probable

16

cause exists." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007).

Plaintiff does not dispute that it is illegal to possess marijuana and cocaine in Georgia. *See* O.C.G.A. §§ 16-13-26(1)(D), 16-13-30(a), (j). She does not dispute that Palmer found marijuana and cocaine in her car. But she does contend that Barrett conspired with Rodney to plant drugs in her car without her knowledge. "Possession of a controlled substance is not a strict liability offense." *Duvall v. State*, 712 S.E.2d 850, 851 (Ga. 2011). Rather, there must be "intent to possess a drug with knowledge of the chemical identity of that drug." *Id.* The record viewed in the light most favorable to Plaintiff would permit a reasonable juror to conclude that she did not have the requisite intent to possess the drugs because she did not know that Rodney left them in her car. Thus, Plaintiff asserts that Barrett manufactured probable cause for her arrest.

It has long been clearly established that "falsifying facts to establish probable cause is patently unconstitutional." *Kingsland*, 382 F.3d at 1232. In *Kingsland*, for example, the plaintiff was arrested for driving under the influence of cannabis based on officers' assertions that she smelled of cannabis. But the plaintiff pointed to seven concrete facts from which a jury could conclude that the officers lied about smelling cannabis. *Id.* at 1226–27. Therefore, the officers were not

entitled to qualified immunity on the plaintiff's false arrest claim; the Eleventh Circuit emphasized that it could not "allow a probable cause determination to stand principally on the unsupported statements of interested officers, when those statements have been challenged and countered by objective evidence." *Id.* at 1228.

Here, a juror viewing the evidence in the light most favorable to Plaintiff could reasonably conclude that Barrett instructed or knowingly allowed Rodney to plant drugs in Plaintiff's car without her knowledge. That evidence would permit a juror to conclude that Barrett was under significant pressure from his boss to put Plaintiff in jail, requiring him to abandon his more traditional law enforcement methods that had been unfruitful and pursue a more aggressive course. Barrett recruited Rodney and gave him drugs to give to Plaintiff, promising Rodney a big payday if he succeeded in getting the drugs into Plaintiff's possession. He told Rodney to leave the drugs where Plaintiff could not reach them. He pre-arranged for a traffic stop to take place before Plaintiff got home, and he made sure that the officer would have a basis to search the car by giving Rodney "loud" marijuana. And then he had Palmer write up the arrest as a normal traffic stop without disclosing his involvement in the operation and Rodney's status as a confidential informant.

Barrett does contend that the Bug Recording gave him arguable probable cause to believe that Plaintiff had accepted the drugs from Rodney because Barrett heard Rodney say he would leave the drugs "right here" and did not hear Plaintiff object. But Barrett did not hear Plaintiff accept the drugs or otherwise acknowledge that she heard Rodney, and he did not hear any conversation to suggest that Plaintiff and Rodney had completed an illegal drug transaction. Before the car ride, Barrett heard Plaintiff refuse Rodney's offer of drugs several times. Plus, there is evidence that Plaintiff did not know Rodney was leaving drugs in her car. If a jury resolves all of these factual disputes in Plaintiff's favor and further finds that Rodney was knowingly permitted by his handler, Barrett, to leave drugs in Plaintiff's car even if there was no transaction between him and Plaintiff, then it is difficult to see how a reasonable officer in Barrett's position would conclude from all of the facts and circumstances that probable cause existed to arrest Plaintiff for *knowingly* possessing illegal drugs.

Defendants argue that even if Barrett did not have arguable probable cause to direct Plaintiff's arrest for drug possession, he had arguable probable cause to direct Plaintiff's arrest for failing to maintain her lane. Defendants are correct that if Barrett had probable cause or arguable probable cause to direct Plaintiff's arrest for any offense, he is entitled to qualified

immunity as to the warrantless arrest only.  *See Skop*, 485 F.3d
at 1138.  As discussed above, Barrett testified that he saw the
traffic violation, but his driver's testimony creates a fact
question on whether Barrett was actually in a position to see a
violation.  Thus, the Court finds that the evidence, when viewed
as a whole and in Plaintiff's favor, presents a jury question on
whether Barrett actually observed a traffic violation to justify
an arrest.  *See id.* at 1143 (noting that the qualified immunity
question must be "viewed through the appropriate summary judgment
lens" and concluding that a fact question existed on whether the
officer had arguable probable cause for an arrest).

For the foregoing reasons, a juror could conclude that
Barrett manufactured probable cause for Plaintiff's arrest when
he instructed Palmer to arrest Plaintiff.[4]  Barrett is therefore
not entitled to qualified immunity on Plaintiff's § 1983 false
arrest claim.  For the same reasons, he is not entitled to
official immunity on Plaintiff's state law false imprisonment
claim.  *See Lewis v. Ritz Carlton Hotel Co., LLC*, 712 S.E.2d 91,
93 (Ga. Ct. App. 2011) (explaining that a warrantless arrest is
unlawful unless it is supported by "probable cause and exigent
circumstances"); *Bateast v. Dekalb Cty.*, 572 S.E.2d 756, 758 (Ga.
Ct. App. 2002) (finding genuine fact dispute on official immunity

---

[4]  The Court hastens to add that a jury could resolve the factual
disputes in Barrett's favor, not Plaintiff's.  If it does so, then
Barrett will be entitled to qualified immunity.

because jury could infer that officers arrested the plaintiff despite knowing that she did not commit any crime).

**III. Malicious Prosecution Claim**

Plaintiff also makes a malicious prosecution claim against Barrett, contending that Barrett directed Palmer to seek an arrest warrant based on statements that Barrett knew were false. This claim is based on Plaintiff's assertion that Barrett knew or should have known that Plaintiff did not knowingly possess the drugs that Rodney left in her car. Plaintiff claims that Barret knew that she did not have the requisite intent to possess the drugs, and seeking an arrest warrant under such circumstances amounts to malicious prosecution. Defendants seek summary judgment on several grounds, which the Court addresses in turn.

A.    Failure to Assert Federal Malicious Prosecution Count

In her Complaint, Plaintiff did not explicitly include a count for malicious prosecution under § 1983. Defendants contend that she should not be permitted assert one by raising it in her response brief. Plaintiff clearly asserted a state law malicious prosecution claim in her Compliant. Compl. ¶¶ 90-93, ECF No. 1. She also clearly alleged that she was bringing claims under § 1983. *Id.* at 1 & 3 ¶ 6. Finally, she alleged sufficient *facts* to support a federal law malicious prosecution claim. *See id.* ¶¶ 16-21 (alleging facts regarding the officers' plan to have Rodney plant drugs in her car), *id.* ¶ 28 (alleging that Barrett

knew that Plaintiff had not requested or otherwise sought to procure the drugs from Rodney), *id.* ¶ 46 (alleging that Plaintiff was incarcerated after her arrest and until she posted bond), *id.* ¶ 67 (alleging that Defendants concealed the true facts about Plaintiff's arrest when they presented the arrest warrant to a judge). The Court is therefore satisfied that the Complaint alleges sufficient facts to put Defendants on notice that Plaintiff was asserting a § 1983 claim for malicious prosecution. The Court declines to dismiss this claim simply because Plaintiff did not label it correctly. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) (per curiam) (noting that the federal pleading rules simply "call for 'a short and plain statement of the claim showing that the pleader is entitled to relief'" and "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted" (quoting Fed. R. Civ. P. 8(a)(2))).

B. The Merits of Plaintiff's Malicious Prosecution Claim

"To recover for malicious prosecution, a plaintiff must prove '(1) the elements of the common law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures.'" *Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016) (quoting *Kingsland*, 382 F.3d at 1234). "The common-law elements include '(1) a criminal prosecution instituted or continued by the present defendant; (2)

with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused.'" *Id.* (quoting *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003)). "A police officer who applies for an arrest warrant can be liable for malicious prosecution if he should have known that his application 'failed to establish probable cause[]' or if he made statements or omissions in his application that were material and 'perjurious or recklessly false[.]'" *Id.* (citation omitted) (quoting *Kelly v. Curtis*, 21 F.3d 1544, 1553-54 (11th Cir. 1994)).

Defendants cannot seriously dispute that there was a criminal prosecution that was instituted when Palmer obtained the arrest warrant at Barrett's direction. Defendants do not dispute that the criminal prosecution terminated in Plaintiff's favor or that she claimed to suffer injury as a result. They do assert that Plaintiff did not point to sufficient evidence to create a fact dispute on malice or the absence of probable cause. But, as discussed above, there is a jury question on whether Barrett manufactured probable cause for Plaintiff's arrest on drug possession charges, so a reasonable juror could conclude that Barrett acted with malice and without probable cause. Accordingly, Barrett is not entitled to official immunity on Plaintiff's state law malicious prosecution claim. He is likewise not entitled to qualified immunity on her § 1983

malicious prosecution claim, as long as there was a Fourth Amendment seizure.

Defendants argue that there was no Fourth Amendment seizure for purposes of a malicious prosecution claim, and thus Plaintiff's § 1983 malicious prosecution claim should be dismissed. This argument focuses only on the initial warrantless arrest. It is true that a warrantless arrest cannot form the basis for a § 1983 malicious prosecution claim because there must be a seizure in relation to the prosecution. *See Black*, 811 F.3d at 1267. In other words, there must be "a seizure 'pursuant to legal process.'" *Id.* (quoting *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)). "Legal process includes an arrest warrant." *Id.* So, if a plaintiff's claim is based on a warrantless arrest without probable cause, then the claim is properly brought as a false arrest claim rather than a malicious prosecution claim. Here, although Plaintiff was initially arrested without a warrant, she presented evidence that she remained incarcerated *after* Palmer obtained the arrest warrant at Barrett's direction. Therefore, the Court finds that Plaintiff has presented sufficient evidence of a seizure in relation to the prosecution and pursuant to legal process, and Barrett is thus not entitled to summary judgment on her § 1983 malicious prosecution claim.

## IV. Due Process Violation Claim

Plaintiff also asserts a Fourteenth Amendment due process claim based on Barrett's failure to disclose the details of the reverse sting operation to the assistant district attorney. Investigators have an obligation under *Brady v. Maryland*, 373 U.S 83 (1963) to turn "exculpatory and impeachment evidence over to the prosecutor" unless "they have reason to believe that the prosecutor already has" the evidence. *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996). The Eleventh Circuit has emphasized that Brady "protects an accused's due process right to a fair trial" and "requires disclosure of both exculpatory and impeachment evidence that is material" to the outcome of a trial. *Id.*

The Court does not doubt that Rodney's status as a paid confidential informant who received the drugs in this case from the narcotics unit qualifies as *Brady* material. But the Eleventh Circuit has suggested that the failure to disclose *Brady* material only violates due process "when a defendant is *convicted in a trial* in which the prosecution failed to disclose to the defense exculpatory or impeachment evidence that undermines confidence in the outcome of the trial." *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998) (per curiam) (emphasis added) (noting that *Brady* protects a defendant from "erroneous conviction" (quoting *United States v. Newton*, 44 F.3d 913, 918 (11th Cir. 1994)). In *Flores*,

as in this case, the plaintiff who brought a due process claim based on a failure to disclose *Brady* materials was not tried and convicted and thus "did not suffer the effects of an unfair trial." *Id.* Rather, the charges against him were nolle prossed, just like the charges against Plaintiff were in this case. The Eleventh Circuit in *Flores* concluded that the district court erred in denying qualified immunity to the defendants in that case because the plaintiff had not shown that the defendants "violated a clearly established right under *Brady*." *Id.* The Court cannot distinguish *Flores* and thus finds that Barrett is entitled to qualified immunity on Plaintiff's Fourteenth Amendment due process claim.

CONCLUSION

For the reasons set forth above, the Court grants Defendants' summary judgment motion (ECF No. 43) as to all claims against Palmer. Defendants' summary judgment motion as to the claims against Barrett is granted as to Plaintiff's Fourteenth Amendment due process claims but denied as to all of Plaintiff's other claims.[5]

---

[5] The Court emphasizes that it is not finding that Barrett is not entitled to qualified immunity in this case. It simply holds that he is not entitled to *summary judgment* because a genuine factual dispute exists as to whether he purposefully directed a confidential informant to plant drugs on Plaintiff and then insisted that she be prosecuted for possessing those drugs, knowing that she did not possess the illegal contraband with the requisite criminal intent. *See Kingsland*, 382 F.3d at 1233-34 (explaining that officers could still prevail on the merits if the jury resolved factual disputes in their favor).

IT IS SO ORDERED, this 19th day of March, 2018.

S/Clay D. Land
_____
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA